UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| RONALD K. HOOKS, Regional Director of the Nineteenth Region of the National Labor Relations Board, for and on behalf of NATIONAL LABOR RELATIONS BOARD,<br><br>　　　　　　　Petitioner,<br><br>　v.<br><br>AIM AEROSPACE SUMNER, INC.,<br><br>　　　　　　　Respondent. | CASE NO. C17-6061 BHS<br><br>ORDER DENYING PETITION FOR PRELIMINARY INJUNCTION |

This matter comes before the Court on the petition for preliminary injunctive relief of Petitioner Ronald K. Hooks, Regional Director of the Nineteenth Region of the National Labor Relations Board, for and on behalf of National Labor Relations Board ("NLRB") (Dkt. 1). The Court has considered the pleadings filed in support of and in opposition to the petition and the remainder of the file and hereby denies the petition for the reasons stated herein.

## I. PROCEDURAL AND FACTUAL BACKGROUND

On December 21, 2017, the NLRB filed the instant petition seeking preliminary relief. Dkt. 1. The NLRB alleges that Respondent AIM Aerospace Sumner, Inc. ("AIM") engaged in unfair labor practices leading to a decertification petition and

withdrawal of recognition of the International Association of Machinists, District 751 ("Union") as the exclusive bargaining agent for some of AIM's employees. The NLRB submitted evidence in support of the allegations that AIM (1) blamed the union for the inability to provide union employees with a pay raise, (2) assisted the efforts of employee Lori Ann Downs-Haynes ("Downs-Haynes") in her efforts to collect signatures on a decertification petition by transferring her to different work areas to contact other employees, (3) failed to reprimand or prevent Downs-Haynes from collecting signatures or promoting the decertification efforts during work hours, and (4) rewarding Downs-Haynes with a promotion and raise two days after submitting the petition to the company. *See* Dkt. 2 at 9–15. The alleged unlawful activities began in the spring of 2017. The signatures were gathered between June 28 and July 18, 2017. Dawn-Haynes submitted the petition to AIM on July 21, 2017. AIM determined that 142 employee signatures were valid, out of a bargaining unit of 272, and, on July 24, 2017, notified the Union that it was withdrawing recognition immediately based on 142 signatures, which was a majority of the employees.

On January 15, 2018, AIM responded to the petition. Dkt. 13. AIM contends that the NLRB conducted a flawed investigation into the alleged unfair labor practices and filed the administrative complaint based solely on affidavits obtained from Union stewards and supporters.

On January 19, 2018, NLRB replied. Dkt. 28. On February 7, 2018, the Court held a hearing on the petition.

## II.  DISCUSSION

Section 10(j) permits a district court to grant relief "it deems just and proper." 29 U.S.C. § 160(j). "To decide whether granting a request for interim relief under Section 10(j) is 'just and proper,' district courts consider the traditional equitable criteria used in deciding whether to grant a preliminary injunction." *McDermott v. Ampersand Publ'g, LLC*, 593 F.3d 950, 957 (9th Cir. 2010). Thus, when the NLRB seeks § 10(j) relief, it "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). "'[S]erious questions going to the merits' and a balance of hardships that tips sharply towards the [NLRB] can support issuance of a preliminary injunction, so long as the [NLRB] also shows that there is a likelihood of irreparable harm and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

In all cases, however, the NLRB "must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction." *Id.* at 1131. "[T]he court must evaluate the traditional equitable criteria through the prism of the underlying purpose of section 10(j), which is to protect the integrity of the collective bargaining process and to preserve the [NLRB's] remedial power." *Scott v. Stephen Dunn & Assocs.*, 241 F.3d 652, 661 (9th Cir. 2001) (internal quotation marks omitted), *abrogated on other grounds as recognized by McDermott*, 593 F.3d at 957.

## A. Likelihood of Success on the Merits

In the Ninth Circuit, the NLRB "in a § 10(j) proceeding 'can make a threshold showing of likelihood of success by producing some evidence to support the unfair labor practice charge, together with an arguable legal theory.'" *Frankl v. HTH Corp.*, 650 F.3d 1334, 1356 (9th Cir. 2011) (quoting *Miller v. Cal. Pac. Med. Ctr.*, 19 F.3d 449, 460 (9th Cir.1994) (en banc)).

In this case, the NLRB's legal theory is that the Union's loss of support was caused by AIM's unfair labor practices. A union generally "enjoys a presumption that its majority representative status continues." *Bryan Mem'l Hosp. v. NLRB*, 814 F.2d 1259, 1262 (8th Cir. 1987). This "presumption can only be rebutted by a good faith belief of the employer, based on objective factors, that the union has lost its majority status." *NLRB v. Am. Linen Supply Co.*, 945 F.2d 1428, 1433 (8th Cir. 1991). The "employer is not permitted, however, to rely on a union's loss of majority support caused by the employer's own unfair labor practices." *Radisson Plaza Minneapolis v. NLRB*, 987 F.2d 1376, 1383 (8th Cir. 1993). To determine "whether a causal relationship exists between the unremedied unfair labor practices and the subsequent expression of employee disaffection with an incumbent union," the Board considers factors including:

> (1) the length of time between the unfair labor practices and the withdrawal of recognition; (2) the nature of the violations, including the possibility of a detrimental or lasting effect on employees; (3) the tendency of the violations to cause employee disaffection; and (4) the effect of the unlawful conduct on employees' morale, organizational activities, and membership in the union.

*In Re Miller Waste Mills, Inc.*, 334 N.L.R.B. 466, 468 (2001), *enforced*, 315 F.3d 951 (8th Cir. 2003).

Even under the Ninth Circuit's low bar on this element, the Court finds the NLRB's position is not a strong one. One factor slightly in the NLRB's favor is the temporal connection between the alleged unfair practices and the withdrawal of recognition. The alleged transferring of Downs-Haynes to different work areas in an effort to contact more employees and the alleged failures of AIM to shut down employees discussing the petition while working occurred in the months leading up to the withdrawal. On the other hand, the NLRB has failed to show that the alleged violations had any unduly coercive effect on any employee, that any alleged violation caused employee disaffection, or that any alleged violation would result in an adverse effect on any employee's morale, organizational activities, and membership in the Union.[1] The only possible allegation in the NLRB's favor is that AIM's managers informed some employees that they could not receive raises because they were members of the Union. AIM responds that the collective bargaining agreement included a set pay scale, which is a legitimate explanation for the inability to give a raise because of Union membership. Under these circumstances, the Court finds that the NLRB has presented a very weak

---

[1] Regarding coercion, there is evidence that Downs-Haynes promised raises if the withdrawal of recognition succeeded. *See*, *e.g.*, Dkt. 2-1 at 68 ("Lori Ann [Downs-Haynes] is promising employees raises and perks if they sign the petition."). But, in the declarant's very next sentence, his manager told him "we can't promise anything" and that Downs-Haynes's promises were "an outright lie." *Id*. Therefore, even if Downs-Haynes used coercive statements, managers informed those who asked that the statements were incorrect. The Court assumes that, if the NLRB has evidence of any coercion by AIM or its managers, the evidence would have been cited in its brief.

case on the causal relationship between the alleged unfair labor practices and the withdrawal of recognition. The Court, however, recognizes the binding low bar on this element and the presumption of continuing Union representation. Therefore, the Court finds that NLRB has just barely shown a likelihood of success on the merits as to some finding of at least one unfair labor practice.

**B.     Likelihood of Irreparable Harm**

"[I]rreparable injury is established if a likely unfair labor practice is shown along with a present or impending deleterious effect of the likely unfair labor practice that would likely not be cured by later relief." *Frankl*, 650 F.3d at 1362. Violations are more likely to "have detrimental and lasting effects" if they involve "coercive conduct such as discharge, withholding benefits, and threats to shutdown the company operation." *Tenneco Auto., Inc. v. NLRB*, 716 F.3d 640, 650 (D.C. Cir. 2013).

In this case, the NLRB has failed to show that the alleged irreparable injury, if any exists at all, is proportional to the relief requested. The alleged unfair labor practices do not involve discharging employees, withholding of benefits, or any threat to shut down the company if the employees unionize. Instead, the NLRB argues that the Union has lost majority support even though it continues to meet with AIM employees.[2] According to the decertification petition, the Union lost majority support by six votes.[3] At the

---

[2] "The union is still very active. They have a pizza meeting once a month at a local restaurant to discuss 'the new contract.'" Dkt. 23, ¶ 19.

[3] 142 of 272 employees signed the petition, and it seems that AIM had to assume that employees who didn't sign the petition supported the Union. In other words, if only 136 employees signed the petition, then AIM would have had to assume the vote was 136-136.

hearing, the Court inquired whether the NLRB would agree to a lesser form of relief than that requested in its proposed order. The Court offered the possibility of working together to obtain a new independent vote to determine the status of Union representation pending review instead of Court-imposed Union representation pending review. At the very least, the Court could oversee an independent attempt to contact the employees who signed the petition, exclusive of Downs-Haynes, to assure the majority of signatures were voluntary. The NLRB, however, refused the Court's offer stating that its position was that there was no way to have a fair election that is not impacted by the alleged unfair labor practices.[4] As stated above, the Court finds as suspect the element of causation or the "impact" of the alleged unfair practices. The Court respects the NLRB's position, but finds that the NLRB has failed to show irreparable harm in the absence of reinstating the Union as the collective bargaining agent for the duration of this proceeding.

Furthermore, there exists a dispute as to the status quo and the timing of this petition. The status quo is withdrawal from the Union, which has been in existence since July 2017. Delay in filing a petition does not bar a finding of irreparable harm. *McKinney ex rel. N.L.R.B. v. S. Bakeries, LLC*, 786 F.3d 1119, 1125 (8th Cir. 2015) ("the delay between the July 2013 withdrawal of recognition and the Director's February 2014 request for injunctive relief does not bar a finding of irreparable harm as complicated labor disputes like this one require time to investigate and litigate."). However, delay

---

[4] Evidently, one of the NLRB's remedial powers is to schedule an election. *See McKinney ex rel. N.L.R.B. v. S. Bakeries, LLC*, 786 F.3d 1119, 1124 n.5 (8th Cir. 2015). The fact that it chose to file this petition instead implicitly shows that it may have decided against an election.

without evidence of majority support for the Union is evidence that no deleterious effects exist. The NLRB's position on this point is mostly hypothetical based on other cases. Dkt. 2 at 21–25. The NLRB does state that, "as noted above, employee support for the Union has already dissipated." *Id*. at 24. Without further explanation, the Court assumes that the NLRB is referring to the decertification petition showing that at least 141 employees, excluding Downs-Haynes, voluntarily signed the petition without threat or coercion. The loss of support appears to be voluntary, and the NLRB has failed to submit evidence of any other unlawful acts encouraging dissipation.

Finally, the NLRB contends that, without preliminary relief, any remedy at the end of the proceeding will be too late to protect employee choice. The NLRB argues that the "employees predictably will shun the Union because their working conditions will have been virtually unaffected by collective bargaining for several years, and they will have little, if any, reason to support the Union." Dkt. 2 at 24 (citing *Int'l Union of Elec., Radio & Mach. Workers, AFL-CIO v. N. L. R. B.*, 426 F.2d 1243, 1249 (D.C. Cir. 1970)). This hypothetical detriment arises in circumstances where the company delays or impedes *initially* bargaining with a union that holds majority support of the employees. The Court agrees that, under such circumstances, support for a union may dissipate to non-majority status if the union is unable to efficiently or timely bargain with an employer. This rationale, however, does not fit the facts of this case. Instead, the employees have experienced the benefits of collectively bargaining, and the majority of them voluntarily decided to withdraw support. If the working conditions deteriorate, then it would seem that the Union would gain support. On the other hand, if the working conditions remain

unaffected or improve, then support for the Union would naturally dissipate, and it would be the Union's burden to convince a majority of employees that it could bargain for even better conditions of employment. Thus, the Court finds that the NLRB has failed to show that immediate action is necessary to protect employee choice. The majority of employees, even excluding Downs-Haynes, have made a choice, and the Court finds no irreparable harm in failing to immediately overturn that vote with a two- to three-year mandate while this matter proceeds through the administrative process.

**C.     Other Factors**

The Court finds that the balance of equities and the public interest factors are at best neutral but more likely tip in AIM's favor. "The task of the Board in devising a final remedy is 'to take measures designed to recreate the conditions and relationships that would have been had there been no unfair labor practice.'" *Frankl*, 650 F.3d at 1366 (*Franks v. Bowman Transp. Co.*, 424 U.S. 747, 769 (1976)). Based on the NLRB's evidence, the status quo is that one out of 142 employees may have been coerced or received beneficial treatment during the drive to obtain signatures on the decertification petition. It is unclear how the NLRB will devise a final remedy for these actions. At this point, however, the NLRB has failed to show that undermining the voluntary choice of 141 employees is either in the public interest or tips the equities in favor of the Board.

Furthermore, the NLRB fails to show that an injunction on this evidence would "protect the integrity of the collective bargaining process." *Scott*, 241 F.3d at 661. The process includes the right to withdraw support. Denying that right on these allegations would undermine an important aspect of the entire process by setting a precedent that the

withdrawal process can be halted for years based on a company allegedly supporting the efforts of *one employee*. The better precedent is to determine the voluntariness and desires of the other 141 employees *and* fashion a sanction against AIM for its actions if the allegations are proven true. Granting the NLRB's injunction as requested does not coincide with that precedent.

**D.    Conclusion**

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24 (citing *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008)). As the moving party, the NLRB bears the burden to establish that this extraordinary remedy is appropriate for these circumstances. The Court finds that the NLRB has failed to meet its burden because only the likelihood of success element tips slightly in its favor while the other three elements tip in favor of AIM. Even under the sliding scale approach, the NLRB has failed to establish serious questions going to the merits or that the balance of hardships tips sharply in its favor. *Cottrell*, 632 F.3d at 1135. The Court has found that, while the NLRB may ultimately succeed in showing some unfair labor practices, serious flaws exist in its theory that these practices *caused* the majority of AIM's employees to sign the decertification petition. Similarly, the NLRB has failed to show that the balance of hardships tips sharply in its favor. Although deterioration of support for the Union while the matter proceeds is possible, the evidence before the Court establishes that a majority of the employees voluntarily signed the decertification petition. It would be a greater hardship on these employees to force them to work under the rejected Union contract for the next few years than it is to force the Union to actively maintain and/or

increase employee support for its representation.  In sum, the NLRB has failed to establish that preliminary injunctive relief is appropriate under either analysis.

### III.  ORDER

Therefore, it is hereby **ORDERED** that the NLRB's petition for preliminary injunctive relief (Dkt. 1) is **DENIED**.

The Clerk shall enter a JUDGMENT and close the case.

Dated this 13th day of February, 2018.

BENJAMIN H. SETTLE
United States District Judge